**TEXAS TECH UNIVERSITY,**
Plaintiff/Counter–
Defendant,

v.

**John SPIEGELBERG, Individually and d/b/a Red Raider Outfitter, Defendant/Counter–Plaintiff.**

Nos. CIVA 5:05CV192C,
CIVA 5:05CV276C.

United States District Court,
N.D. Texas,
Lubbock Division.

Nov. 2, 2006.

---

James L. Wharton, Jones, Flygare, Brown & Wharton, Lubbock, TX, Jerre B. Swann (pro hac vice), R. Charles Henn Jr. (pro hac vice), Alicia Grahn Jones (pro hac vice), Kilpatrick Stockton LLP, of record for Plaintiff.

James L. Gorsuch, James L. Gorsuch, P.C., Lubbock, Stacey L. Barnes, Barnes & Associates, PLLC, Houston, TX, of record for Defendant.

### ORDER

CUMMINGS, District Judge.

Came on for consideration this day the following motions:

*A. By Defendant/Counter–Plaintiff John Spiegelberg ("Spiegelberg")*

(1) Motion for Summary Judgment [# 76], filed September 15, 2006.

*B. By Plaintiff/Counter–Defendant Texas Tech University ("Texas Tech" or "the University")*

(1) Motion for Summary Judgment [# 142], filed September 21, 2006; and

(2) Motion for Leave to File a Reply [# 148], filed October 23, 2006.

The Court is of the opinion that Texas Tech's Motion for Leave to File a Reply should be **GRANTED** and the Reply attached to the Motion for Leave to File a Reply is deemed filed.

After reviewing all of the arguments, together with their respective responses, the Court is of the opinion that Texas Tech's Motion for Summary Judgment should be **GRANTED**. The Court is further of the opinion that Spiegelberg's Motion for Summary Judgment should be **DENIED**.

### I.

### BACKGROUND

Texas Tech is a public, state-funded university located in Lubbock, Texas. Since its founding in 1923, Texas Tech has been commonly known as Texas Tech University, Texas Tech, and "Tech." In addition to its many academic affiliations and activities, Texas Tech competes in NCAA-governed sporting events through its association with the Big 12 Conference.

Since the inception of the Texas Tech football program in 1925, the school has developed mascots, phrases, and insignia ("marks") which have come to be associated with the school and its athletic program. Among the marks that identify Texas Tech which are at issue in this case

are the "Double T" (see Pl.'s Br. in Supp. of Mot. for Summ. J. 3), the team name "Red Raiders," and a picture of the "Masked Rider" (a horseman wearing a mask and wide-brimmed hat who leads the football team onto the playing field) (see *id.* at 4). Other marks at issue include "Raider Red" (a caricatured cowboy adapted from the drawings of cartoonist Dirk West (see *id.* at 5–6)), the phrase "Wreck 'em Texas Tech," and the word "Raiderland" (a term borrowed from the name of Texas Tech's marching band which refers to the school).

For years, Texas Tech has capitalized on these marks by allowing licensees to print these words and images on apparel, flags, signs, dishes, and numerous other items. These licensees pay royalties to Texas Tech for each licensed item they sell. Currently, Texas Tech allows over 450 licensees to sell these officially licensed products. Each year, Texas Tech's licensees sell approximately $8 million in licensed products.

Defendant Spiegelberg owns a retail establishment known as "Red Raider Outfitters." "Red Raider Outfitters" consists of two stores. The most prominent retail outlet is located across the street from Texas Tech's main campus. The other store is located in a shopping mall in Lubbock, Texas. The majority of Spiegelberg's inventory is made up of Texas Tech-related apparel and novelties. In fact, Spiegelberg's storefront is decorated with Texas Tech's signature colors, and the store's logo includes a "Raider Red" character. Although Spiegelberg was licensed to sell official Texas Tech merchandise for many years, Texas Tech terminated that license in 2003 due to Spiegelberg's failure to account for the University's share of the royalties. Since the termination of his license, Spiegelberg has continued to mar-

ket and sell unlicensed merchandise with Texas Tech marks.

Texas Tech brought this action against Spiegelberg in this Court. Texas Tech has alleged that Spiegelberg is liable for federal trademark infringement, federal unfair competition, breach of contract, state trademark infringement, common law trademark infringement and unfair competition, federal trademark dilution, and state trademark dilution and injury to business reputation. Spiegelberg counteralleged that he was entitled to declaratory judgment on each of Texas Tech's claims and that Texas Tech was liable to him for trademark infringement and unfair competition. Additionally, Spiegelberg has asserted the affirmative defenses of failure to state a claim upon which relief can be granted, unclean hands, and laches.

## II.

### *STANDARD*

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotations omitted). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. 2505. In making its determination, the court must draw all justifiable inferences in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505. Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," the non-movant must come forward, after adequate time for discovery, with significant proba-

tive evidence showing a triable issue of fact. FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir.1990). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428 (5th Cir.1996) (en banc); *SEC v. Recile,* 10 F.3d 1093, 1097 (5th Cir.1993).

To defeat a properly supported motion for summary judgment, the non-movant must present more than a mere scintilla of evidence. *See Anderson,* 477 U.S. at 251, 106 S.Ct. 2505. Rather, the non-movant must present sufficient evidence upon which a jury could reasonably find in the non-movant's favor. *Id.* The pleadings are not summary judgment evidence. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Giles v. General Elec. Co.,* 245 F.3d 474, 493 (5th Cir. 2001) (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). Absent a showing that there is a genuine issue for trial, a properly supported motion for summary judgment should be granted. *See Eversley v. MBank Dallas,* 843 F.2d 172, 173–74 (5th Cir.1988); *Resolution Trust Corp. v. Starkey,* 41 F.3d 1018, 1022–23 (5th Cir.1995).

A party moving for summary judgment may support that motion with appropriate evidence in an attempt to negate an essential element of the non-movant's claim or defense, but summary judgment is also appropriate when the movant shows that there is no evidence to support an essential element of the non-movant's claim or de-

fense. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548 (1986). In order to withstand a no-evidence motion for summary judgment, the non-movant must present evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial. *Id.* The purpose of summary judgment, as the Supreme Court has instructed, is to "enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990); *Liquid Air Corp.,* 37 F.3d at 1075. A court is to resolve all factual controversies in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Liquid Air,* 37 F.3d at 1075. Summary judgment is appropriate when a party fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548 (1986).

Furthermore, "summary judgment is appropriate where the only issue before the court is a pure question of law." *Sheline v. Dun & Bradstreet Corp.,* 948 F.2d 174, 176 (5th Cir.1991); *see also Neff v. Am. Dairy Queen Corp.,* 58 F.3d 1063, 1065 (5th Cir.1995) ("Consequently, we hold that because the disputed issue in this case is purely legal, it was appropriately resolved through summary judgment.").

## III.

### *DISCUSSION*

#### *Trademark Infringement*

■ The main purpose of the cause of action for trademark infringement is to

"secure the owner of the trademark the goodwill of his business and to protect the ability of consumers to distinguish among competing products." *Eppendorf–Netheler–Hinz GMBH v. Ritter GMBH,* 289 F.3d 351, 355 (5th Cir.2002). In order to prove a trademark infringement under 15 U.S.C. § 1125(a), a court must first determine if the mark qualifies for protection. *Sno–Wizard Mfg., Inc. v. Eisemann Prods. Co.,* 791 F.2d 423, 425 (5th Cir. 1986). To make this determination, the court must look at the functionality, distinctiveness, and secondary meaning of the marks.

■ The concept of functionality separates protectable marks from marks which courts will not allow a party to monopolize. *Id.* at n. 2. Functionality prevents a mark owner from controlling a useful product feature. *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). A product feature is considered functional if it is "essential to the use or purpose of [the product] or if it affects the cost or quality of the [product]." *Id.* at 165, 115 S.Ct. 1300. In short, the functionality doctrine bars protection of a feature which is "essential to the use or purpose of the article or if it affects the cost or quality of an article.... [I]f a product feature is the reason the device works, then the feature is functional." *Eppendorf,* 289 F.3d at 355.

■ If it is clear that the functionality doctrine does not bar the mark from protection, the court must then determine if the mark is distinctive. *Sno–Wizard,* 791 F.2d at 426, n. 2. A mark is distinctive if it "serves as a symbol of origin." *Id.* A mark is distinctive and therefore protectable if it is either 1) inherently distinctive, or 2) has become distinctive through a secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). A product is in-

herently distinctive if its "intrinsic nature serves to identify [a] particular source." *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). However, "trademark law requires a demonstration of secondary meaning only when the claimed trademark is not sufficiently distinctive of itself to identify the producer." *Two Pesos,* 505 U.S. at 767, 112 S.Ct. 2753 (internal citations omitted). A mark has become distinctive through secondary meaning where it "has come through use to be uniquely associated with a specific source." *Id.* at n. 4, 112 S.Ct. 2753. To show secondary meaning, the party claiming infringement must show that the primary significance of the mark is to identify the source of the product rather than the product itself. *Id.; Wal–Mart Stores,* 529 U.S. at 210, 120 S.Ct. 1339. Indeed, courts have even held that words, colors (green-gold dry cleaning press pads), shapes (the Coca–Cola bottle), sounds (NBC's distinctive three chimes), and smells (the aroma of plumeria flowers on sewing thread) may act as trademarks where they have gained secondary meaning. *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 162, 169, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). However, the Supreme Court has held that color cannot be inherently distinctive but may be protected if it has a secondary meaning. *Wal–Mart Stores,* 529 U.S. at 211, 120 S.Ct. 1339.

■■ After the court has determined that the mark is protectable by establishing that the functionality doctrine does not apply, and the mark is inherently distinctive or has a secondary meaning, the court must then move to the key inquiry of trademark infringement. *Sno–Wizard,* 791 F.2d at 425. "The gravamen for any action of trademark infringement or common law unfair competition is whether the challenged mark is likely to cause confu-

sion." *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985); *Soc'y of Fin. Exam'rs v. Nat'l Ass'n of Certified Fraud Exam'rs*, 41 F.3d 223, 227 (5th Cir.1995) (holding that to prove its claim of trademark infringement, plaintiff must show that defendant's use of the mark was "likely to create confusion in the minds of potential purchasers as to source, affiliation, or sponsorship of the parties' products"); *The Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 483 (5th Cir.2004) ("To prove trademark infringement and unfair competition under federal law, [the plaintiff] must show that the use of the ... mark by [the defendant] is likely to cause confusion among consumers as to the source, affiliation, or sponsorship of [the defendant's] products or services"); *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir.1975); *Oleg Cassini, Inc. v. Cassini Tailors, Inc.*, 764 F.Supp. 1104, 1108 (W.D.Tex.1990) ("Trademark infringement occurs whenever, without consent of the registrant, a person uses in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive") (internal quotation marks omitted). Trademark infringement occurs where a party uses a mark that "suggests an affiliation or connection with a trademark owner, or that causes a likelihood of confusion as to sponsorship or endorsement ...." *Oleg Cassini*, 764 F.Supp. at 1108. "In general, the greater the similarity between products ..., the greater the likelihood of confusion." *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 666 (5th Cir.2000). In determining the likelihood of confusion, courts must compare the marks to determine if they are, indeed, confusing. *Marathon*, 767 F.2d at 219. Courts may consider the similarity of both sound and appearance of the marks in making this determination. *Id.* According to the likelihood-of-confusion standard, the plaintiff must show that the confusion is not just possible, but probable. *Scott Fetzer*, 381 F.3d at 483.

■ To determine whether the challenged mark is likely to cause confusion, courts weigh the digits of confusion. These factors include the type of trademark at issue; similarity of design; similarity of the products; identity of retail outlets and purchasers; identity of advertising media; the defendant's intent; and actual confusion. *Roto–Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir.1975); *Marathon*, 767 F.2d at 217; *Scott Fetzer*, 381 F.3d at 485; *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir.1998); *Sno–Wizard*, 791 F.2d at 425; *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir.1980); *Westchester Media*, 214 F.3d 658. However, the digits are not dispositive and the court should consider all relevant factors. *Marathon*, 767 F.2d at 218–219. Indeed, the digits of confusion are flexible and not intended to be exhaustive. *Scott Fetzer*, 381 F.3d at 485. It is not necessary for the court to positively find a majority of the digits in order to find that a trademark infringement has occurred. *Elvis Presley Enters.*, 141 F.3d at 194. Justice requires that the court look at all relevant factors, even those not enumerated in the digits of confusion. *Id.*

The court may consider remedies for trademark infringement after determining that there is a likelihood of confusion. *Marathon*, 767 F.2d at 218. However, the court may not reach this inquiry if no likelihood of confusion exists.

### A. The Texas Tech Marks

■ In applying the law to the facts of the present case, it is clear that Spiegelberg has infringed upon Texas Tech's trademark. First, Texas Tech's marks are protectable because they are not functional and they are distinctive.

Spiegelberg has invoked the functionality doctrine to argue that Texas Tech's use of the scarlet and black color scheme cannot be protected.[1] By itself, the use of a color (or combination of colors) as a trademark does not offend the functionality doctrine. *Qualitex*, 514 U.S. at 164, 115 S.Ct. 1300. Here, Spiegelberg has produced no evidence that the use of the Texas Tech color scheme could affect the cost or quality of the products or are the reason the products work. *See Eppendorf*, 289 F.3d at 355. Indeed, it is unclear how one could argue that the mere adding of the Texas Tech color scheme could be "the reason the [product] works." *Id.* Texas Tech's marks appear on licensed goods such as pens, book ends, knit caps, coffee mugs, and flip-flops. The mere fact that any of these items bear a Texas Tech mark does not affect how the product works. The fact that a knit cap is scarlet and black or bears a "Double T" does not affect the quality of the cap or its ability to keep one's head warm.

■ However, the scarlet and black color scheme of a product can serve the important function of showing that the product is officially licensed by Texas Tech. *See Qualitex*, 514 U.S. at 162, 115 S.Ct. 1300. Here, the scarlet and black colors adorning these products have a secondary meaning which "identifies and distinguishes" the products. *Id.* at 163. Indeed, products which are sold in Lubbock, Texas, that bear the scarlet and black color scheme have become associated with a specific source-Texas Tech. *See Two Pesos*, 505 U.S. at 766 at n. 4, 112 S.Ct. 2753.

■ Additionally, the other contested marks are inherently distinctive because they intrinsically identify the source of the product upon which they are placed. *See Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753. Products bearing Texas Tech marks automatically signal to the purchasing public that those products are licensed by the University. This is especially so for those consumers who purchase items with Texas Tech marks in stores such as "Red Raider Outfitters." Items sold in stores such as Spiegelberg's have a legitimacy which automatically leads potential purchasers to believe that the items are officially licensed by Texas Tech.

■ Since the Texas Tech marks are not functional and are distinctive, the Court must now consider whether Spiegelberg's unlicensed use of the marks is likely to cause confusion in the minds of potential purchasers as to their source, affiliation, or sponsorship. *See Scott Fetzer*, 381 F.3d at 483. First, many courts have found that "confusion is more likely ... if the products in question are impulse items or are inexpensive." *Sno–Wizard*, 791 F.2d at 428. Here, the unlicensed products of which Texas Tech complains are all inexpensive, which are often purchased on a whim. Clearly, the thought and consideration one puts into purchasing a t-shirt is drastically less than the thought one would put into purchasing a grandfather clock or a sofa. Indeed, the products bearing the contested marks are inexpensive, impulse-purchase items by any definition.

Further, the digits of confusion weigh in Texas Tech's favor. The Court must first consider the type of marks. This digit

---

1. Spiegelberg has alleged functionality only as to Texas Tech's scarlet and black color scheme. He has not claimed that any of the other contested marks are functional.

requires the Court to weigh the strength and distinctiveness of Texas Tech's mark. *Amstar*, 615 F.2d at 259. Generally, courts afford wide protection to strong marks. *Id.* Here, Texas Tech's marks are extremely strong. Many of the Texas Tech marks originated in the 1920s and 1930s. (Pl.'s App. 2) In fact, football fans all over the nation are familiar with marks such as the "Double T," the Masked Rider, and Raider Red. Further, the University has used these self-identifying marks in prominent places such as its website. (*Id.* at 20.) In short, the strength of these marks is undeniable, and they merit broad protection.

The second digit of confusion also weighs in Texas Tech's favor because the unlicensed products and the licensed products have a great similarity of design. In determining the similarity of design, the Court must compare the total effect of the design. *Amstar*, 615 F.2d at 259. Although individual features of the design are relevant in this determination, the Court should focus on "the commercial impression of the mark as a whole." *Id.* In the present case, the commercial impression of the unlicensed products and the licensed products is identical. Clearly, a Texas Tech fan who enters Spiegelberg's store will be affected in the same way by an unlicensed "Double T" coffee mug as by a licensed one. Doubtless, Spiegelberg's unlicensed products are marketed entirely to Texas Tech alumni, supporters, and sports fans. Spiegelberg's inventory, both licensed and unlicensed, is designed to rally school pride and bolster support for the University. The licensed items and the unlicensed items have an identical commercial effect: to serve as outward signs of support for Texas Tech University.

The third digit of confusion also falls on the side of Texas Tech because the products are similar in every respect. "In general, the greater the similarity between products ..., the greater the likelihood of confusion." *Westchester Media*, 214 F.3d at 666 (quoting *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir.1980)). In its Memorandum in Support of Summary Judgment, the Plaintiff has produced photographs of two licensed scarlet and black Texas Tech shirts alongside two unlicensed Texas Tech shirts. Although the unlicensed shirts sport different logos, the shirts are extremely similar. The unlicensed shirts have identical color schemes and overall designs.

Analysis of the fourth digit of confusion also falls heavily in Texas Tech's favor. Confusion is far more likely where the plaintiff's and defendant's goods are sold at similar retail outlets and to similar consumers. *See Amstar*, 615 F.2d at 262. In the present case, Spiegelberg sells both licensed goods and unlicensed goods side-by-side. (Pl.'s App. 362, 386.) According to Mrs. Spiegelberg's deposition, the Spiegelbergs purchase licensed products bearing the Texas Tech marks from licensed wholesalers. (*Id.*) Spiegelberg sells these items alongside its unlicensed products. Hence, at least two retail outlets from which consumers may purchase licensed and unlicensed goods are identical. Further, it is incontrovertible that shoppers who purchase both licensed and unlicensed products are cut from the same cloth. Whether the products are licensed or unlicensed, the only possible purchasers consist of those consumers who wish to show their support for Texas Tech. Since the retail outlets from which the licensed and unlicensed products are sold and the consumers who purchase the products are identical, this digit weighs heavily in favor of Texas Tech.

Further, the likelihood of confusion of the unlicensed products with the

licensed products is great because of Spiegelberg's advertising methods. "The use of a mark in advertising is highly probative of whether the mark creates a likelihood of confusion in relation to another mark." *Elvis Presley Enters.*, 141 F.3d at 197. Evidence of a similar, unlicensed mark used in advertising is "probative of the reaction of prospective purchasers to the mark." *Id.* Likewise, "the context of the presentation of a mark ... is relevant to the meaning that the mark conveys." *Id.* Here, Spiegelberg has adopted a cowboy character for use in his advertising which looks very much like Texas Tech's "Raider Red." Like the "Raider Red" character, the Spiegelberg cowboy wears a white hat, a black mask covering his eyes, boots and spurs, and has a belt buckle adorned with a "T." (*See* Pl.'s App. 75–76, 263–64.) Spiegelberg uses this cowboy character on his sign and on his website. (*Id.* at 263–64.) Because of the great similarity between "Raider Red" and the Spiegelberg cowboy used in advertising the unlicensed goods, prospective purchasers could very likely become confused as to whether the products being sold through the store and the website are licensed. Surely, the Spiegelberg cowboy's great resemblance to Raider Red would probably cause a great deal of confusion as to whether the products-or even the store itself-are directly sanctioned by Texas Tech. In addition to the similarity of Spiegelberg's advertising methods, the media in which he advertises the unlicensed goods are also similar to those in which licensed goods are advertised. Both the licensed goods and the unlicensed goods are advertised in the Texas Tech student newspaper, the internet, television, and radio. (*Id.* at 416–17, 418, 419–20.)

█ Another digit which weighs in favor of Texas Tech is Spiegelberg's intent to confuse consumers. Although the court need not find that the defendant intended to confuse, the presence of a defendant's intent "weights heavily against an accused infringer ...." *Oleg Cassini,* 764 F.Supp. at 1112; *see also Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 596–597 (5th Cir.1985). Usually, parties show the defendant's intent to confuse consumers by producing evidence that the defendant tried to "pass off [his] product as that of another." *Amstar,* 615 F.2d at 263. Other similarities which show the defendant's intent to confuse include imitation of packaging material, use of identical code numbers, or adopting of similar distribution methods. *Id.* In the present case, Texas Tech has produced summary judgment evidence that Spiegelberg knowingly placed tags on unlicensed products which indicated that the products were "Officially Licensed." (Pl.'s App. 372A–327B.) In fact, Mrs. Spiegelberg gave deposition testimony that a large number of garments which bore the "Officially Licensed" tag were not officially licensed. (*Id.*) Knowingly placing "Officially Licensed" tags on unlicensed products clearly shows that the Defendant intended to confuse the prospective purchasers. Not only does this summary judgment evidence weigh in favor of the likelihood of confusion, it "weights heavily." *See Oleg Cassini,* 764 F.Supp. at 1112.

█ Finally, the actual confusion digit weighs in favor of Texas Tech. Although actual confusion is not necessary for a finding of a likelihood of confusion, it is the best evidence of the likelihood of confusion. *Roto–Rooter,* 513 F.2d at 46; *Amstar,* 615 F.2d at 263; *Sno–Wizard,* 791 F.2d at 429; *Elvis Presley Enters.,* 141 F.3d at 204. Further, "reason tells us that ... very little proof of actual confusion would be necessary to prove the likelihood of confusion." *Roto–Rooter,* 513 F.2d at 46 (quoting *World Carpets, Inc. v. Dick*

*Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971)). Also, the court can base a finding of infringement on actual confusion that caused consumer interest, even if that interest does not result in a sale. *Elvis Presley Enters.,* 141 F.3d at 204 (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:6 (4th ed.1997)). Here, Texas Tech has produced summary judgment evidence that at least three customers expressed actual confusion as to whether Texas Tech had licensed Spiegelberg's unlicensed products. (Pl.'s App. 442–45, 446–50.) These instances of actual confusion are the best evidence that a likelihood of confusion exists.

In sum, each of the digits of confusion weigh in Texas Tech's favor. The likelihood of confusion is clear. Spiegelberg has clearly infringed upon Texas Tech's clearly established marks.

### Unfair Competition

■ Unfair competition occurs when a defendant passes off his products as the plaintiff's products by virtue of their substantial similarity. This practice leads to the confusion of potential customers. *Boston Prof'l Hockey Ass'n,* 510 F.2d at 1010. Unfair competition is a broader cause of action than trademark infringement. However, "the same facts which would support an action for trademark infringement would also support an action for unfair competition." *Id.; Marathon,* 767 F.2d at 217. Therefore, the plaintiff must prove the likelihood of confusion in order to succeed on an unfair competition claim. *See Scott Fetzer,* 381 F.3d at 484.

■ In the present case, it is clear that Spiegelberg has engaged Texas Tech in unfair competition. As explained more fully above, there is a very strong likelihood of confusion of the licensed and unlicensed products which bear the Texas Tech marks. The summary judgment evidence

shows that each of the digits of confusion is satisfied and that a likelihood of confusion exists. Therefore, for the reasons mentioned above, it is clear that Spiegelberg has engaged in unfair competition.

### Trademark Dilution

■ Trademark dilution is "the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product." *Id.* at 489. The federal trademark dilution statute is found in 15 U.S.C. § 1125(c). Trademark dilution may occur through either blurring or tarnishing. *Id.* Blurring occurs when the uniqueness or individuality of a mark is diminished because of its use on unrelated goods. *Id.* Tarnishing occurs when the trademark is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Id.* (quoting *Hormel Foods Corp. v. Jim Henson Prods.,* 73 F.3d 497, 507 (2d Cir.1996)). Under federal law, trademark dilution may be proved through circumstantial evidence when the senior mark and the junior mark are identical. *Moseley v. V. Secret Catalogue, Inc.,* 537 U.S. 418, 434, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003).

■ In the present case, Texas Tech has proved trademark infringement under 15 U.S.C. § 1125(c) through circumstantial summary judgment evidence. Texas Tech has produced summary judgment evidence that Spiegelberg has used marks on unlicensed products that are identical to the marks Texas Tech has used for decades. Spiegelberg sells unlicensed products bearing the phrases "Wreck 'em Tech" and "Raiderland," and advertises his stores with Raider Red character. (Pl.'s App. 394–95, 8–9.) These phrases and this

character are identical to marks Texas Tech has used for many years. Indeed, Texas Tech has used the term "Wreck 'em Tech" in its fight song since 1936. (*Id.* at 6.) Further, the term "Raiderland" has been associated with the Texas Tech marching band for about 30 years. (*Id.* at 7.) The summary judgment evidence shows that Spiegelberg has sold unlicensed products with the identical Texas Tech marks since its license was revoked in 2003. (*Id.* at 6.) Therefore, Spiegelberg's use of identical marks constitutes trademark dilution under the Supreme Court's interpretation of 15 U.S.C. § 1125(c). *See Moseley,* 537 U.S. at 434, 123 S.Ct. 1115.

 Further, the summary judgment evidence shows that there is no genuine issue of material fact as to Texas Tech's claims for trademark dilution under Texas law. To establish trademark dilution under Texas law, the plaintiff must show 1) the ownership of a distinctive mark; and 2) a likelihood of dilution. *E. & J. Gallo Winery v. Spider Webs Ltd.,* 129 F.Supp.2d 1033, 1037 (S.D.Tex.2001). Just as in federal law, state trademark infringement can occur through either blurring or tarnishing. The Texas statute does not require the mark to be famous, that the plaintiff and defendant are business competitors, or that there is a likelihood of consumer confusion. *Id.* at 1037. A mark is "distinctive" for the purposes of Texas trademark dilution law if it is unique or has a secondary meaning. *Id.* Here, it is inarguable that the Texas Tech marks are unique to the University. People (particularly college sports fans) all across the

nation associate the "Masked Rider," "Raider Red," and the "Double T" with Texas Tech. Many more associate the terms "Raiderland" and "Wreck 'em Tech" to Texas Tech. Indeed, even Texas Tech's scarlet and black color scheme are uniquely associated with the University and its athletic program.[2]

Further, Spiegelberg's use of the marks is almost certain to cause dilution by blurring. The circulation of unlicensed products bearing Texas Tech's marks will likely blur the uniqueness of officially licensed products. Undoubtedly, the sale of unlicensed products will result in diminished individuality of the officially licensed products.

Because the summary judgment evidence shows that the Texas Tech marks are unique and there is a likelihood of dilution, there is no genuine issue of material fact as to its trademark dilution claims under Texas law. Further, there is no genuine issue of material fact under federal trademark dilution law. Therefore, Texas Tech's motion for summary judgment on the issue of trademark dilution is **GRANTED.**

### Breach of Contract

 In the present case, the underlying licensing agreement between Texas Tech and Spiegelberg required that the contract be construed in accordance with the laws of the state of Georgia. In order to prove a breach of contract under Georgia law, the plaintiff must prove 1) a valid

---

**2.** Even if it cannot be said that Texas Tech's scarlet and black color scheme is distinctive across the nation, it would not affect the analysis. This is so because trademark rights are territorial in nature. *See* McCarthy, *supra,* § 26.27. Therefore, the relevant territory which the Court must consider in determining the distinctiveness of the scarlet and black

color scheme is not national, but local to Texas Tech. In the area around Texas Tech, the scarlet and black color scheme is certainly unique to Texas Tech. In this university town, a display of the scarlet and black color scheme on a game day (or any other day) is almost certainly a show of support for Texas Tech.

contract existed;[3] 2) the material terms of that contract; and 3) the damages arising from the breach. *TDS Healthcare Systems Corp. v. Humana Hospital Ill., Inc.,* 880 F.Supp. 1572, 1583 (N.D.Ga.1995).

■ First, Texas Tech has produced summary judgment evidence that Spiegelberg has sold unlicensed products bearing Texas Tech's marks after his license had expired. According to the contract, Spiegelberg was not allowed to continue to sell materials which bore the Texas Tech marks after the expiration of the contract.[4] (Pl.'s App. 310.) Clearly, Spiegelberg sold such material after Texas Tech terminated the contract. Therefore, Spiegelberg breached the contract.

■ Furthermore, Spiegelberg breached the contract by trying to register the phrases "Wreck 'em Tech" and "Raiderland" with the United Stated Patent and Trademark Office. The material terms of the contract forbid Spiegelberg from filing a trademark application with any government entity for the Texas Tech "licensed indicia." (Pl.'s App. 305.) According to the contract, the "licensed indicia" included "... names, symbols, designs, and colors of [Texas Tech], including without limitation, the trademarks, service marks, designs, team names, nicknames, abbreviations, city/state names in the appropriate context, slogans, logographics, mascots, seals, and other symbols associated with or referring to [Texas Tech]." (*Id.* at 302.) Further, the contract provided that its provisions would survive the termination or expiration of the contract. (*Id.* at 310.)

Texas Tech has produced uncontroverted summary judgment evidence that Spiegelberg has filed a trademark application with the United States Patent and Trademark Office attempting to gain exclusive rights to the phrases "Wreck 'em Tech" and "Raiderland." (*Id.* at 9–10.) This action clearly violated the contract. In light of the contract's provision forbidding Spiegelberg's attempt to register the "Licensed Indicia," which included "names ... including ... team names, nicknames ... [and] slogans ...," Spiegelberg clearly violated the contract. Therefore, Plaintiff's Motion for Summary Judgment on the issue of breach of contract is **GRANTED**.

### Damages

Under the Lanham Act, the plaintiff whose rights in a mark have been violated may recover the infringer's profits, the plaintiff's damages, and costs. 15 U.S.C. § 1117(a). The plaintiff has the burden of proving the profits that the defendant realized from the sales, while the defendant must prove any costs or deductions. *Id.*

■ Here, Texas Tech has produced summary judgment evidence that Spiegelberg's gross profits for 2004 until October 2005 totaled $2,870,975.82.[5] However, Spiegelberg has not directed the court to any summary judgment evidence of deductions.[6] Without such evidence, Texas Tech

3. Neither Texas Tech nor Spiegelberg argues that the contract was invalid.

4. In addition to the unlicensed products, Spiegelberg also sells licensed products which he purchased from licensed vendors. The Court did not consider the sale of these officially licensed products in any part of its analysis.

5. Spiegelberg has not produced any evidence of gross profits which he earned after October 2005.

6. In his Brief in Opposition to the Motion for Summary Judgment, Spiegelberg vaguely directs the Court to "Exhibit 16, RRO's Responses to TTU's Interrogatories" for evidence of its expenses. However, Spiegelberg's "Appendix" to the Brief in Opposition consists of approximately 350 pages of haphazardly filed material. In violation of the

is entitled to the full amount of Spiegelberg's profits. According to the plain meaning of the Act, the plaintiff is entitled to the full amount of the defendant's gross sales where the defendant has not produced any evidence of deductions. *See New York Racing Ass'n v. Stroup News Agency,* 920 F.Supp. 295, 301 (N.D.N.Y. 1996); McCarthy, *supra,* § 30.66. Therefore, Texas Tech is entitled to Spiegelberg's gross profits of $2,870,975.82 which were accumulated until October 2005, as well as Spiegelberg's gross profits since October 2005.

■ As mentioned above, the statute also provides for the plaintiff to be awarded damages which he sustained as a result of the infringement. 15 U.S.C. § 1117(a). Here, Texas Tech is entitled to such damages in the form of the royalties it would have received on the sale of the unlicensed products. In his treatise, Professor McCarthy explained that, "[u]sually, when the courts have awarded a royalty for past acts of infringement, it was for continued use of a mark after a license ended and damages were measured by the royalty rate the parties had agreed on." McCarthy, *supra,* § 30:85. Here, Texas Tech and Spiegelberg agreed that the University would receive a royalty of eight percent of the sale of goods with the marks. (Pl.'s App. 312.) Since Spiegelberg did not di-

rect the Court to any summary judgment evidence which would show deductions, Texas Tech is entitled to $229,676.62–eight percent of Spiegelberg's gross profits from January 2004 to October 2005. Further, Texas Tech is entitled to eight percent of Spiegelberg's gross profits earned from November 2005 to the present.

■ Finally, Texas Tech argues that it is entitled to attorney's fees because Spiegelberg's conduct was egregious. Attorney's fees are available under the Lanham Act in "exceptional cases." 15 U.S.C. § 1117(a). Generally, courts find that attorney's fees are appropriate where the infringement is intentional, deliberate, or willful. *Newborn v. Yahoo! Inc.,* 437 F.Supp.2d 1, 8 (D.D.C.2006). In the present case, Spiegelberg's conduct was intentional, deliberate, and willful. Obviously, Spiegelberg was aware that his license to sell official Texas Tech products was revoked in 2003. However, Spiegelberg intentionally, deliberately, and willfully continued to sell these products. Therefore, Spiegelberg's activities constitute the "exceptional circumstances" for which the statute provides. Therefore, Texas Tech is hereby ORDERED to file, on or before 9:00 a.m. on November 13, 2006, an application for attorney's fees supported by affidavit, attesting to the attorney's fees ac-

Court's Local Rules, none of these pages are consecutively numbered. L.R. 56.6 ("Each page of the appendix must be numbered legibly in the lower, right-hand corner". The first page must be numbered as "1," and succeeding pages must be numbered sequentially through the last page of the entire appendix (i.e., the numbering system must not re-start with each succeeding document in the appendix.)) Further, most of the documents have been filed without exhibit numbers. There is simply no way of knowing to which of the many pages Spiegelberg is referring when he directs the Court to "Exhibit 16." According to Local Rule 56.5(c), "[a] party whose motion or response is accompa-

nied by an appendix must include in its brief citations to *each page* of the appendix that supports each assertion that the party makes concerning the summary judgment evidence." *Id.* (emphasis added). In other words, factual assertions must be supported by page-specific citations to proper and admissible summary judgment evidence that support such an assertion. This Court will only consider the admissible summary judgment evidence discussed and specifically identified in the parties' motions and responses. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991).

crued during the prosecution of this case so that they may be considered in assessing a reasonable attorney's fee against Spiegelberg. Any controverting affidavit must be filed by Spiegelberg on or before 9:00 a.m. on November 21, 2006.

### Spiegelberg's Affirmative Defenses

In his response, Spiegelberg reasserted the affirmative defenses of waiver, acquiescence, laches, estoppel, unclean hands, fraud, and the *Rectanus* defense. However, the summary judgment evidence shows that these defense are without merit.

In his defenses of waiver, acquiescence, estoppel, and laches, Spiegelberg argues that Texas Tech may not complain of the unlicensed products because he has used the mark for many years and Texas Tech has failed to complain before. Further, Spiegelberg uses the defenses to argue that Texas Tech has not enforced its rights in the marks against other alleged infringers and therefore cannot enforce its rights against Spiegelberg. However, Texas Tech has produced summary judgment evidence that it reacted to Spiegelberg's sale of unlicensed products almost immediately after the University revoked Spiegelberg's license to sell officially licensed products. (Reply App. 43.) The summary judgment evidence shows that on February 4, 2004, Texas Tech informed Spiegelberg that his license was terminated and ordered him to stop manufacturing, selling, or distributing merchandise bearing the University's marks. (*Id.*) Hence, though Spiegelberg is correct in asserting that Texas Tech did not complain of his unlicensed use of the marks until recently, the fact remains that Spiegelberg sold licensed products until 2004. (*Id.*) As soon as Texas Tech revoked Spiegelberg's license, the University began taking steps to ensure that he would not sell unlicensed products. Further, Texas Tech has pro-

duced summary judgment evidence that it has pursued other prospective trademark infringements, particularly at local liquor stores. (*Id.* at 45A–45B.) Therefore, the summary judgment evidence shows that Spiegelberg's affirmative defenses of waiver, acquiescence, estoppel, and laches are without merit.

Spiegelberg also argues that Texas Tech engaged in fraud by attempting to license the phrase "Wreck 'em Tech," and by infringing on Warner Brothers' mark because Raider Red is confusingly similar to Yosemite Sam. Specifically, Spiegelberg claims that Texas Tech committed fraud against state and federal trademark offices by registering the phrases "Raiderland" and "Wreck 'em Tech" because he originated those phrases. However, Texas Tech has produced summary judgment evidence that it has owned these marks for many decades. The University has used the term "Wreck 'em Tech" in its fight song for over 70 years. (Pl.'s App. to Mot. Summ. J. 6.) Further, Texas Tech has used the phrase "Wreck 'em Tech" on apparel since 1975. (*Id.* at 6–7.) Spiegelberg has not directed the Court to any summary judgment evidence that would contradict these assertions. Other than his bald assertions in the pleadings, there is no evidence supporting Spiegelberg's allegations of fraud.

Spiegelberg's allegations that Texas Tech has unclean hands also fails. In short, Spiegelberg claims that Texas Tech may not assert a claim against him for violating its marks because Texas Tech has violated Warner Brothers' marks. Spiegelberg bases this assertion on the alleged resemblance of "Raider Red" to the Warner Brothers cartoon character Yosemite Sam. Even if, *arguendo*, Texas Tech had somehow violated Warner Brothers' mark, the University could still bring action to protect its own trademark. Ac-

cording to Professor McCarthy, "a [d]efendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world. The plaintiff's speculative dispute with a third party does not concern the defendant." McCarthy, *supra,* § 31:160. Clearly, Spiegelberg's defense of unclean hands is without merit.

Finally, Spiegelberg claims that he may continue to use the "Raider Red" character, the scarlet and black color scheme, and the phrases "Wreck 'em Tech" and "Raiderland" pursuant to the *Rectanus* Doctrine. *See United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). However, Spiegelberg's use of the *Rectanus* Doctrine is misplaced. According to Professor McCarthy, this equitable doctrine requires that the good-faith user of the mark be geographically remote.

> The net result of the . . . *Rectanus* decision[ ] is that under common law, absent appropriate federal legislation, the national senior user of a mark cannot oust a geographically remote good-faith user who has used the mark first in a remote trade area. . . . The rationale is clear: . . . the senior user cannot preempt remote geographical markets before it actually enters them either by advertising, reputation, or actual sales. . . . A "remote" territory is one where, at the critical date of the junior user's first use, the senior user's mark was not known by customers in that territory, such that no one would have been confused as to the source.

McCarthy, *supra,* § 26:4.

Even if the Court views Spiegelberg's asserted facts in a light most favorable to him (as the Court must in determining if summary judgment is proper), his assertions do not invoke the *Rectanus* Doctrine. In spite of Spiegelberg's claims that he was the first user of many of Texas Tech's marks, he has not produced any summary judgment evidence that he first used the marks in a remote trade area. In fact, the summary evidence shows that Spiegelberg has two stores that predominately market Texas Tech merchandise. (Def.'s Mot. Summ. J. 1.) One of the Spiegelberg stores is located in a Lubbock shopping mall, and the other is located across the street from Texas Tech's main campus. (*Id.*) Further, Spiegelberg claims (without directing the court to summary judgement evidence substantiating those claims) that he had used many of the disputed marks since the mid–1980s. However, Spiegelberg does not direct the Court to any summary judgment evidence that his Lubbock stores were in a remote territory where Texas Tech's marks were unknown to consumers. *See* McCarthy, *supra,* § 26:04. Therefore, Spiegelberg's reliance on the *Rectanus* Doctrine is misplaced.

## IV.

### *CONCLUSION*

The Court, for the reasons articulated herein, hereby ORDERS that Defendant's Motion for Summary Judgment is **DE-NIED** and Plaintiff's Motion for Summary Judgment is **GRANTED**. Plaintiff shall file, on or before 9:00 a.m. on November 13, 2006, any application for attorney's fees supported by affidavit. Any controverting affidavit must be filed by Defendant on or before 9:00 a.m. on November 21, 2006.

All other pending motions are denied as moot.

All relief not explicitly granted herein is hereby denied.